IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ELIAS NYSTROM,

                Plaintiff,

     vs.

KHANA MARINE LTD.; NOK CO.
LTD. S.A., *in personam*; and the M/V
SUAH, Official Number 43379-12-B,
her engines, winches, gear, and
appurtenances, *in rem*,

                Defendants.

Case No. 3:20-cv-00098-JMK

**DECISION AND ORDER**

       This matter came before the Court for a four-day bench trial. The Court heard the testimony of multiple witnesses, and the parties submitted accompanying exhibits. Based on the foregoing, and the record as a whole in this case, the Court now enters the following Findings of Fact and Conclusions of Law.[1]

---

[1] *See* Rule 52(a)(1), Federal Rules of Civil Procedure ("In an action tried on the facts without the jury . . . the court must find the facts specially and state its conclusions of law separately."). Findings of fact in a civil case are by a preponderance of the evidence.

# I.   FINDINGS OF FACT

1.     Plaintiff Elias Nystrom is a resident of California.   Since 2015, Nystrom has worked seasonally as a fish processor for UniSea in Dutch Harbor, Alaska, during the "A" season.   The "A" season runs from approximately early January into mid-April each year.   Following his work for UniSea, Nystrom returns to California for the remainder of the year, where he collects unemployment.   Trial Tr. Day 1 at 51:15; Trial Tr. Day 2 at 24:6–25:5 (Nystrom); Trial Tr. Day 3 at 85:17 (Partin).

2.     At the end of the 2017 "A" season, but before heading back to California, Nystrom applied for and was hired to work as a "sign in" longshoreman for Pacific Stevedoring ("PacSteve").   PacSteve is a stevedoring company in Dutch Harbor that—among other things—contracts with vessel owners to provide longshore labor.   The longshore labor transfers and loads packages of frozen fish from fishing vessels into the freezer cargo holds of reefer vessels that carry the cargo onto various international ports. Declaration of Andrew Murphy, ECF No. 34-1 at ¶ 3.   Reefer vessels are freighters that are designed to carry chilled or frozen food cargos in their cargo holds.   The vessels have refrigerated cargo holds that are chilled to a specified temperature.   When transporting cargos of frozen seafood, the cargo holds of the reefer vessels must be chilled to temperatures well below freezing to prevent the cargo from thawing.   Murphy Dec. at ¶ 6.

3.     Most reefer vessels that load frozen seafood cargo in Dutch Harbor have three cargo holds.   Each cargo hold is covered by a main hatch cover, which is a watertight steel cover that prevents rain- or seawater from entering the cargo hold when the hatch is closed.   Within each cargo hold are three deck levels called the "A," "B," and

"C" decks. The C deck is the lowest cargo deck level, the B deck is the middle deck level, and the A deck is the uppermost cargo deck that sits just below the watertight hatch. Cargo is stowed on each of these deck levels. Murphy Dec. at ¶ 7.

4. Cargo is lowered into the cargo holds using the vessel's booms and cargo winches. The hatch cover on the main deck has to be open to allow cargo to be lowered down into the hold. The center areas of the A and B decks have "tween deck hatch covers" that also can be opened, so that cargo can be lowered through these openings to the decks below them. Thus, to load cargo on the C deck, the main hatch cover, and the tween deck hatch covers of the A and B decks would have to be open. The ship's crew open the hatch covers to provide PacSteve with access to the deck where the PacSteve longshore workers will be stowing cargo. Murphy Dec. at ¶ 8.

5. Because PacSteve loads boxes of frozen seafood into the refrigerated cargo holds of reefer vessels in Dutch Harbor, and because cargo operations can last for several days, the cargo holds have to be chilled before they load cargo into them. Otherwise, the seafood may thaw and result in damage to or loss of the cargo. For this reason, the cargo holds on reefer vessels loading seafood in Dutch Harbor are chilled to temperatures well below freezing before PacSteve begins loading cargo in them. However, the refrigeration units are turned off about an hour before the cargo operations begin and are not turned on while longshoremen are working in the cargo holds. Murphy Dec. at ¶ 9; Deposition of Capt. Chong, 60:11–62:12.

6. The nature of the work loading frozen seafood onto reefer vessels requires PacSteve longshoremen to routinely work in icy and slippery conditions. Icy

cargo decks on reefer vessels loading cargos of frozen seafood in Dutch Harbor is a common condition that longshoremen often encounter. If the temperature of a cargo deck is below freezing, then rain or snow falling through the open hatch during cargo operations sometimes may form ice on the area of the cargo deck located beneath the open hatch. PacSteve longshore workers are experienced in these conditions and trained to work safely around them. If it is not possible to work around these conditions, PacSteve longshoremen are trained to ensure that the ice is safely cleared before continuing their work. Murphy Dec. at ¶¶ 10–16.

7.     The Court previously found that PacSteve owner Andrew Murphy possesses the requisite knowledge, skill, experience, and training to testify in the form of an opinion regarding the conduct of cargo loading operations aboard reefer vessels in Dutch Harbor, including the allocation of responsibility between PacSteve longshoremen and vessel crew members for various aspects of such operations. Docket 37 at 14–15. In particular, Mr. Murphy is qualified as an expert to offer opinion testimony regarding the responsibility for dealing with slippery or icy conditions that develop on cargo decks. *Id.* The Court further finds that PacSteve gang boss Joel Gumera also is qualified, by virtue of his experience, training, and knowledge, to offer expert opinion testimony on those subjects. Both Murphy (via declaration submitted in conjunction with summary judgment) and Gumera credibly testified that professional longshoremen in Dutch Harbor are experienced and trained to work safely around icy or slippery conditions that develop on cargo decks during cargo operations, and know how to do so safely. PacSteve workers often work on and around such slippery and icy conditions.

8. Slippery conditions can form on the cargo decks of reefer vessels, including on the decks inside the cargo holds, if precipitation falls onto frozen cargo decks during cargo operations, because the precipitation will fall through the open cargo hatch and land on the surface of the cargo deck. If the outside temperature is near freezing, the temperature in the cargo hold may remain below freezing for several hours even after the cargo hold has been opened. Also, if there already are frozen boxes of seafood stowed in a cargo hold, that cargo will help to keep the temperature in the cargo hold cold. In these conditions, rain that falls onto the cargo decks during cargo operations can form ice. As the employer of its longshoremen, PacSteve is required by OSHA regulations to deal with and remedy any such conditions that pose an unreasonable risk of injury to its longshore workers. Murphy Dec. at ¶¶ 10–16.

9. The Court finds that a stevedore such as PacSteve that performs cargo operations in Dutch Harbor should reasonably anticipate that ice may form on cargo decks in such conditions.

10. PacSteve has developed safety protocols to address icy and slippery conditions that form on cargo decks during cargo operations aboard reefer vessels in Dutch Harbor. It dispatches its workers as a "gang" to load cargo on cargo vessels. The foreman of the gang is called the "gang boss." The gang boss usually is the senior PacSteve representative on a reefer vessel when cargo operations are underway. The gang boss has many responsibilities, including directing the work of the other members of the gang, interacting with the crew of the reefer vessel, interacting with the crew of the fishing vessel from which cargo is being transferred to the reefer vessel, and making sure that work is

being performed in a safe and efficient manner. The gang boss is responsible for enforcing PacSteve's safety policies when working on reefer vessels. Murphy Dec. at ¶ 17.

11. Before cargo operations begin, the gang boss holds a safety meeting with the gang of longshoremen who will be working on the vessel. The purpose of this meeting is to emphasize the need to work safely and to remind the workers of PacSteve's safety rules. PacSteve has developed a checklist of topics that the gang boss is required to cover during this safety meeting. Among the topics addressed during the pre-shift safety meeting is the possibility that the longshoremen will encounter frozen or slippery surfaces, including slippery cargo hold decks. The gang boss reminds the longshore workers that they may encounter such conditions, and that they should be careful about slipping. They also are instructed to report any slippery or icy deck conditions that they do encounter to the gang boss. If a longshore worker reports slippery or icy deck conditions to the gang boss, the gang boss determines whether those conditions present an unreasonable risk, and whether they can be remedied, or work must stop. Murphy Dec. at ¶ 18.

12. The gang boss inspects the cargo holds before the longshoremen begin work in them. Part of the gang boss's inspection includes inspecting the cargo hold decks for any ice or other slippery substances. During cargo operations, the crews of reefer vessels typically leave tools such as wooden mallets, shovels, and brooms in the cargo holds that can be used by the longshoremen to break up and remove ice that has formed that is impeding the stevedore's work. If the gang boss observes unreasonably icy areas on a cargo deck, or if members of the longshore gang report unsafe icy conditions to the gang boss, the gang boss is responsible for correcting the unsafe condition. The gang boss

can instruct longshore workers to use the tools described above to remove the ice. The gang boss also can ask the ship's crew to assist in removing the ice. But the responsibility for ensuring that ice that has formed on a cargo hold deck is removed ultimately remains with the gang boss, not with the ship's crew. Murphy Dec. at ¶¶ 19–21.

13. During periods of heavy precipitation, the cargo decks may be slippery throughout the course of a cargo operation, even when longshoremen or vessel crews are actively working to remove ice. In these circumstances, it is impossible to keep the decks free of ice or slippery conditions. The gang boss determines if the slippery conditions are such that the expert longshoremen can continue to safely work using reasonable care, or if they need to stop work until conditions improve. Murphy Dec. at ¶ 23; Capt. Chong Dep. at 39:6–42:14; 45:8–18.

14. The Court finds that it is not reasonable for a professional longshoreman to expect an ice-free deck inside of a freezer hold when the hatch cover is open to the elements.

15. Vessels relinquish control of their cargo holds on the arrival of PacSteve longshoremen. PacSteve workers are in charge of the cargo operations in those cargo holds. Members of the ship's crew sometimes enter the cargo holds during cargo operations to discuss with the gang boss the location of cargo in accordance with the stowage plan. The stowage plan is a plan that shows where specific lots of cargo will be stowed in the cargo hold. The stowage plan is used to make sure that the cargo is offloaded at the correct port and delivered to its purchaser. For example, a buyer in Korea may have purchased 1,000 tons of frozen cod from a fishing company in Alaska. The stowage plan

will identify the cargo hold, deck level, and location on the deck where that cod is stowed, which allows the cargo to be located and offloaded when the vessel reaches Korea. The gang boss is provided a copy of the stowage plan so he knows where the cargo is supposed to be stowed. While the ship's crew checks to make sure that PacSteve's workers are stowing cargo in accordance with the stowage plan, the crew do not actively participate in loading the cargo, and they do not supervise or direct PacSteve workers regarding their work loading the cargo inside the hold. Murphy Dec. at ¶ 24. Capt. Chong credibly testified that the vessel relies on the longshoremen to do their job safely because they are professionals experienced in performing cargo operations in Dutch Harbor in icy and slick conditions. Capt. Chong Dep. at 37:8–38:1. This testimony was supported by Joel Gumera and was not contradicted by Nystrom. Trial Tr. Day 2 at 118:5–119:15.

16.     While ice may form on cargo decks beneath an open hatch square, it is less likely to form on those areas of the deck that are not located under the open hatch. It is not possible for precipitation to fall on these covered areas of the lower cargo decks because of the physical coverage of the higher decks. PacSteve provides its workers with wheeled trolleys onto which they can land the cargo they are loading on a cargo deck. They can then push these trolleys from the area of the cargo deck located beneath the hatch square to areas of the cargo deck that are covered. This allows the longshoremen to push the cargo trolleys from areas of the deck that may be slippery due to ice to the covered (and thus dry) areas of the cargo deck where the cartons of seafood can be carried by the longshoremen on the dry, non-slippery areas of the deck. Trial Tr. Day 1 at 29:9–18 (Henry).

17.     As a "sign in" longshoreman, Nystrom would call into PacSteve's offices on days that he was available to work and, if work was available, PacSteve would provide him with a job.  Nystrom was not a full-time employee and was not guaranteed any specific jobs.  Murphy Dec. at ¶¶ 26–27.

18.     Nystrom was first dispatched to work for PacSteve on April 16, 2017, loading frozen fish onto the M/V SUAH ("SUAH"), a reefer vessel owned and operated by Defendants.  Nystrom was dispatched to the SUAH a second time on April 25.  Nystrom's third and final job as a "sign in" for PacSteve was again on the SUAH when he was dispatched on April 29, 2017.  Trial Tr. Day 1 at 127:19–131:5 (Nystrom); Trial Ex. D124.

19.     Just after 2200h on April 29, 2017, in anticipation of PacSteve loading cargo from the SEAFREEZE AMERICA, the crew of the SUAH shut off the refrigeration for Hold No. 3 and opened the hatch cover.  Capt. Chong Dep. at 38:13–18, 61:24–63:17; Trial Tr. Day 2 at 115:18–2 (Gumera); Murphy Dec. at ¶ 9; Trial Ex. D106.

20.     Nystrom arrived onboard the SUAH, along with gang boss Joel Gumera and other longshoremen at 2310h.  Capt. Chong Dep. at 52:19–53:12; Trial Ex. D107, D124.  Gumera brought the longshoremen to the break room, where he held a safety meeting during which he expressly warned Nystrom (and all other longshoremen in his gang) that the decks inside the freezer holds would be slick, and instructed the longshoremen to be on the lookout and exercise extra care.  Gumera reminded the longshoremen to report any unreasonably unsafe conditions to him.  Trial Tr. Day 2 at 12:7–9 (Nystrom); Trial Tr. Day 2 at 89:12–90:3 (Gumera); Trial Ex. D122.

21.     Like most reefer vessels that call in Dutch Harbor, the SUAH has three freezer holds that are accessed through hatch covers on the main deck. When the holds are closed, they are kept well below freezing to ensure that the cargo remains frozen. Each hold has three different decks on which the stevedore can store cargo. The C deck is the lowest, followed by the B deck, then the A deck on top, just below the ship's main deck. The A and B decks have "tween deck" hatch openings that can be used to access the C deck. When any of the hatch covers are open, the decks inside the freezer holds are exposed to the elements. Murphy Dec. at ¶¶ 7–9; Capt. Chong Dep. at 48:5–20.

22.     The parties presented conflicting evidence regarding which hold and deck level Nystrom was working on at the time of his accident. Nystrom testified that he was in Hold No. 1, which is closest to the bow of the ship, but the ship records show that Nystrom and the gang of longshoremen did not load Hold No. 1 with cargo from the SEAFREEZE AMERICA. Instead, the longshoremen loaded cargo in Hold No. 3 (the furthest aft hold, closest to the stern), onto decks A, B and C, and a small amount of cargo in Hold No. 2A. Trial Tr. Day 2 at 124:22–129:9; Capt. Chong Dep. at 55:14–59:15; Trial Ex. D111. The Court finds that the ship's contemporaneous records are accurate, and that Nystrom's accident happened in Hold No. 3. Nystrom further testified that he fell on the lowest deck inside the hold—nearest the hull. This would be the C deck. Once again, the ship's records show that the only cargo loaded onto the C deck from the SEAFREEZE AMERICA was a small amount loaded in 3C, which was loaded on top of previously loaded cargo. *Id.* The Court concludes that the incident could not have occurred on the C deck as Nystrom testified and must have occurred on either the A deck or B deck of Hold No. 3.

23.     Given the ship's records, Nystrom's testimony regarding his work shift and the location and condition of the cargo hold in which he slipped and fell is not credible.  At first, Mr. Nystrom testified that he was in the hold closest to the bow and in the bottom hold or Hold No. 1.  Trial Tr. Day 1 at 77:4–22 (Nystrom).  He was adamant that he slipped in the bottom of that hold or Hold No. 1C.  Trial Tr. Day 1 at 77:4–22; 79:14–18; 145:2–4 (Nystrom).  Nystrom knew it was the bottom of the vessel because he remembered going down three sets of ladders.  Trial Tr. Day 1 at 77:4–22 (Nystrom).  He testified he started work at 3:15 p.m. the day before his accident.  Trial Tr. Day 1 at 103:25–104:6; 127:3–15 (Nystrom).  Nystrom was sure that the hold in which he slipped was empty of cargo when his gang started loading that day.  Trial Tr. Day 1 at 78:2–6; 80:21–23 (Nystrom).  He was adamant it was empty, repeatedly referring to it as a "freshly opened" hold, meaning it had no cargo in it yet.  Trial Tr. Day 1 at 77:4–9; 145:5–9 (Nystrom).

24.     Nystrom's testimony changed on cross-examination, or was disclaimed by his attorney.  After Nystrom was shown the ship's cargo-loading receipts and stowage plan reflecting that his gang had not worked in Hold No. 1 at all, he said he slipped while working in the middle hold or Hold No. 2.  Trial Tr. Day 1 at 147:25–148:6 (Nystrom).  After being shown that the only bottom-deck hold in which Nystrom's gang worked was Hold 3C, but that 3C was nearly full at the time his gang started working and his gang stood on top of already stacked fish boxes and never touched the floor of that hold, Nystrom's lawyer said it appears he fell in Hold 3B.  Trial Tr. Day 2 at 144:11–14 (Choate).  Nystrom said he now recalled going down only two sets of ladders, which would have put him on deck B.  Trial Tr. Day 2 at 6:8 (Nystrom).  After being shown that Hold 3B was not

empty when his gang started working, Nystrom said he now recalled there was already frozen cargo in the hold. Trial Tr. Day 2 at 8–14 (Nystrom). After reviewing his timesheet that showed he started his shift that day at 10:45 p.m. (more than 7 hours after the 3:15 p.m. start time he claimed on direct examination), Nystrom said he must have been mistaken about when he started working that day. Trial Tr. Day 1 at 128:22–129:18 (Nystrom).

25. The longshoremen began loading cargo from the SEAFREEZE AMERICA onto the SUAH at approximately 2315h. Capt. Chong Dep. at 53:8–15. Because the SEAFREEZE AMERICA was the last fishing vessel from which the SUAH accepted cargo before departing for Asia, all of the vessel's cargo holds and decks held cargo from previous fishing vessels. Trial Tr. Day 2 at 125:22–133:14 (Gumera); Capt. Chong Dep. at 53:22–56:25; Trial Ex. D111.24. The PacSteve gang worked in Hold 3 without issue for approximately 4 or 5 hours. After a break, Nystrom went back to work at approximately 0300h on April 30. He testified that it was a "new hold" that was "empty" of product, but once again Nystrom appears to be mistaken. The ship's records and testimony from Capt. Chong and Gumera show that the longshoremen were still loading Hold No. 3 and that since this was the last cargo loaded onboard, none of the holds were empty of product. Trial Ex. D111; Trial Tr. Day 2 at 124:22–128:14 (Gumera).

26. Nystrom testified that he knew the moment that he stepped onto the deck in the freezer hold after his break that it was slick. Trial Tr. Day 1 at 82:7–12 (Nystrom). He variously described it as a sheet of ice or an ice rink, but also as "a little slippery" and as having slippery "spots." Trial Tr. Day 1 at 80:7–8, 82:7–12, 118:23–119:25, 136:4–17; Trial Tr. Day 2 at 52:6–53:5 (Nystrom). According to Nystrom, there

were three vessel crewmembers inside the hold with the longshoremen: the vessel's bosun, directing where the cargo went; and two other unnamed vessel crewmembers using mallets to chip and clear up ice as the longshoremen continued to work. Nystrom testified that the two vessel crewmembers were using large wooden mallets to break ice underneath the open hatch area while the stevedores loaded the cargo. Nystrom testified that gang boss Gumera was not in the hold with him. Trial Tr. Day 1 at 77:4–81:20. The two unnamed vessel crewmembers, according to Nystrom, were focused on breaking up the ice in the area "open to the elements" because "that was the most dangerous point." *Id.* at 92:23–93:4. Nystrom testified that he does not fault the vessel crew, because "[t]hey were trying to do their job." *Id.* at 91:23–25. Nystrom himself did not report the slippery condition to gang boss Gumera. *Id.* at 140:22–25.

27.   Approximately fifteen minutes after starting work in the hold, Nystrom testified that he fell, injuring his left shoulder. Docket 37 at 12.

28.   Gumera's testimony contradicted Nystrom's in several material ways. First, Gumera testified that he inspected the hold before allowing his gang to start work on the evening of April 29 and found it to be in fine condition. He testified that there were some slick patches, which could not be avoided, but it was nothing unusual and nothing they could not work around. Trial Tr. Day 2 at 94:4–95:3 (Gumera). Gumera also recalled being inside the hold stacking boxes with the longshoremen when Nystrom fell. He specifically recalls seeing Nystrom just after he fell, while he was still on the ground. *Id.* at 107:14–23 (Gumera). He went to look at the spot where it occurred and likened it to a patch of frost that he had not noticed before. Gumera testified that it was slick, but it did

not consist of ice that could be broken up or removed.  *Id.* at 104:11–17, 112:2–113:7;
133:19–21, 136:11–15 (Gumera).  Gumera disputed that there were two crewmembers in
the hold breaking ice and testified that ice breaking was not needed in any event.  *Id.* at
94:4–95:3.  After Nystrom fell, Gumera and the longshoremen continued to load cargo in
the same hold without incident.  *Id.* at 133:22–134:7.

29.     The Court finds that the cargo deck in question was not covered in ice
and there was no ice or slick condition beyond the usual conditions reasonably expected
by PacSteve longshoremen in an open freezer hold exposed to the elements.  As noted
above, only that portion of the cargo deck that lies beneath the open hatch cover is exposed
to precipitation.  Most of the cargo deck is covered by the overhanging deck and
precipitation cannot fall on those areas of the cargo deck.  There are no other sources of
water in the cargo hold.  Gumera inspected the cargo hold before cargo operations
commenced to make sure conditions were reasonably safe.  Furthermore, Defendants'
weather expert testified that there had been only trace amounts of precipitation during
periods in April 2017 when the hatch cover to Hold No. 3 had been open.  Trial Tr. Day 3
at 10:12–13:13 (Dr. Bond).  This would be sufficient to wet a sidewalk, but not form a
puddle.  *Id.*  These conditions are not conducive to formation of significant ice.  Further,
both Gumera and Murphy testified that they have never in their lengthy careers as
longshoremen seen a "sheet of ice" inside a freezer hold as Nystrom described it.  Trial Tr.
Day 2 at 112:2–113:7 (Gumera); Day 2 at 167:3–6 (Murphy).  Based on the evidence
presented, the Court finds that any ice or slippery spots inside Hold No. 3 on April 29 and
30, 2017, were consistent with PacSteve's expected and usual working conditions and were

not unreasonably unsafe for a professional stevedore in Dutch Harbor. The Court finds that the slick spot was caused by trace precipitation as it fell into the open freezer hold while the longshoremen worked.

30. The Court concludes that no one, including the vessel crew, had notice of the slippery patch that had formed until Nystrom slipped on it, and further finds that it is the type of condition in which professional stevedores routinely work, and that the slippery spot did not create an unreasonably hazardous condition.

31. After leaving the SUAH, on May 1, 2017, PacSteve required Nystrom to submit to a mandatory post-accident drug test. The test was positive for marijuana. Pursuant to PacSteve's drug and alcohol policies, PacSteve terminated Nystrom's employment eligibility due to his positive drug test. Trial Tr. Day 2 at 40:24–43:17 (Nystrom); Trial Ex. D146; Dr. Damon Borg Dep. at 15:10–14.

32. Nystrom testified that he was a regular user of marijuana when in California, where he had a medical marijuana license, grows marijuana, and smokes daily, but he denied using marijuana while working for PacSteve. Trial Tr. Day 2 at 41:17–45:18 (Nystrom). Defendants' toxicologist Damon Borg testified that the drug test results indicated that Nystrom had in fact consumed marijuana within 2–4 days of the May 1, 2017, test, which would have been during his employment with PacSteve. The Court finds Dr. Borg's testimony to be credible and that Nystrom was dishonest concerning his marijuana use while working for PacSteve.

33. Murphy testified that, as president of PacSteve, he would not recommend reemployment of a "sign in" longshoreman who had tested positive for

marijuana in a post-incident test and that, as a company, PacSteve does not hire longshoremen who have prescriptions for medical marijuana.

34.     Nystrom returned home to California for treatment for his left shoulder.  In February 2019, Plaintiff's treating physician Dr. Lenihan found that Nystrom had reached maximum medical improvement and released him back to work with restrictions that he not engage in repetitive overhead work that involved lifting over 40 pounds.  Dr. Michael Lenihan Dep. at 35:22–37:22; 52:3–7.  Defendants' expert Dr. Battaglia testified that Nystrom's surgery was a routine out-patient surgery, and his recovery was successful.  In light of Nystrom's excellent physical condition, Dr. Battaglia would not place any restrictions on the use of Nystrom's left shoulder.  Dr. Michael Battaglia Dep. at 31:9–34:13.  Having evaluated Nystrom's demeanor, his current work, and Dr. Battaglia's more recent evaluation (Dr. Lenihan last saw Plaintiff in 2019), the Court finds that Dr. Battaglia's testimony is more credible and concludes that Nystrom does not have future restrictions as a result of his 2017 left shoulder injury.

35.     Nystrom returned to work for UniSea for the "A" season in 2020.  He worked both the "A" season and the "B" season at UniSea for the first time in 2022.  Trial Tr. Day 2 at 26:5–27:13 (Nystrom); Trial Ex. D149 at 239:1–240:21.

36.     Nystrom testified that, due to his receipt of workers' compensation benefits, his earnings were higher in 2017, 2018, and 2019 than any year he had ever reported earnings for the past 30 years.  Trial Tr. Day 2 at 20:17–18, 23:3–6 (Nystrom). The Court finds that Nystrom has not shown any past wage loss resulting from his 2017 injury.

37.     Defendants' vocational expert credibly testified that Nystrom is earning higher wages post-injury than he was pre-injury.  Trial Tr. Day 3 at 44:21–45:5 (Berg).  Nystrom conceded he is earning more now than before the injury.  Trial Tr. Day 2 at 23:12–19 (Nystrom).

38.     Nystrom testified that if it were not for his injury in this case, his intent was to find housing in Dutch Harbor and obtain full time employment with PacSteve.  Nystrom admits that he only worked as a temporary longshoreman for three jobs prior to the injury.  Trial Tr. Day 2 at 52:5–10 (Nystrom).  Defendants presented testimony from economist Brett Partin, who reviewed PacSteve's hiring records and Nystrom's work history.  Partin credibly testified that, based on his seasonal pattern of work, changing employers, and the high turnover at PacSteve, Nystrom statistically was very unlikely to obtain full time work as a PacSteve longshoreman.  Trial Tr. Day 3 at 88:23–91:17 (Partin).  Vocational expert John Berg similarly opined that Nystrom's work and earnings history strongly suggested he would not have become a full-time longshoreman.  Trial Tr. Day 3 at 40:7–42:17 (Berg).  The Court agrees and finds that Nystrom has not shown any loss of earning capacity as a result of this incident.

## II.    CONCLUSIONS OF LAW

1.     Plaintiff asserts claims against Defendants under the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. § 905(b).  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1333.

2.     Section 905(b) of the LHWCA gives an injured longshoreman a cause of action against a vessel for its negligence.  The parties do not dispute that Nystrom's

claims are governed by the LHWCA or that Defendants are a "vessel" for purposes of the Act.

3.     Prior to 1972, a longshoreman injured in the course of his employment could receive modest compensation payments from his employer, the stevedore, and he also could bring an action against a vessel owner where he could recover if he could prove that the owner was negligent or that the ship was unseaworthy.  "Unseaworthiness could be proven merely by showing that a dangerous condition existed on the ship; no showing of fault on the part of the owner was necessary, and even if the unsafe condition had been created by the stevedore, the shipowner was liable for the longshoreman's injuries." *Lieggi v. Maritime Co. of Philippines, etc.*, 667 F.2d 324, 326 (2d Cir. 1981).  But, in 1972, Congress amended the LHWCA.  It sharply increased the compensation a longshoreman could recover from his stevedore employer.  But, the revised statute abolished the warranty of seaworthiness and provided that recovery was possible against the vessel owner only if the longshoreman could show that the vessel owner was negligent.  *See* 33 U.S.C. §§ 904, 905, 906.

4.     In *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S. Ct. 1614 (1981), the United States Supreme Court identified three primary duties that a vessel owner owes a longshoreman for purposes of the LHWCA.  Although the primary responsibility for the safety of the longshoremen rests upon the stevedore, the vessel owes to longshore workers aboard the vessel:  (1) the "turnover duty," which relates to the condition of the vessel upon the commencement of stevedoring operations; (2) the "active control duty," which applies once stevedoring operations have commenced and

provides that the vessel must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel; and (3) the "duty to intervene," which concerns the vessel's obligation with regard to cargo operations in areas under the principal control of the stevedore. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97–98 (1994) (citing *Scindia*, 451 U.S. at 166 (cleaned up)). Following this Court's order on summary judgment, only the active control duty remains at issue. ECF No. 37.

5. Under the active control duty, the vessel will be liable if it actively involves itself in cargo operations and, in so doing, negligently injures a longshoreman, or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, that are under the active control of the vessel during the stevedoring operation. *Scindia*, 451 U.S. at 167; *Howlett*, 512 U.S. at 98. The obligation of a vessel to act reasonably if it actively participates in cargo operations, and to avoid exposing the longshoremen to harm from hazards they may encounter in areas under the active control of the ship, must be viewed from the perspective of an expert and experienced longshoreman. *Marable v. United States*, 2017 U.S. Dist. LEXIS 210383 at *13 (S.D. Cal. Dec. 21, 2017) (citing *Scindia*, 451 U.S. at 166–67 ("This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property")).

6. To trigger the active control duty, "the vessel must have substantially controlled or been in charge of (i) the area in which the hazard existed, (ii) the

instrumentality which caused the injury, or (iii) the specific activities the stevedore undertook." *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 540 (3d Cir. 1994).

7.     If the active control duty is triggered, to recover against the vessel plaintiff must show "(1) that the vessel appreciated, should have appreciated, or with the exercise of reasonable care would have appreciated, the condition; (2) that the vessel knew, or should have known, that the condition posed an unreasonable risk of harm to a longshore worker; (3) that a longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of the harm, or (ii) protect himself or herself from the danger; and (4) that the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition." *Davis*, 16 F.3d at 541.

8.     Nystrom testified that the vessel's bosun was inside the hold making sure the cargo was placed according to the stowage plan and that there were two other crewmembers actively removing ice as it formed inside the hold.  He asserts that this amounts to active control, requiring the vessel crew to exercise reasonable care to prevent injury to him.  The Court does not find Nystrom's testimony regarding ice breaking credible in light of Gumera's testimony and evidence that there had not been precipitation in April 2017 that would have formed sufficient ice to break.

9.     Even if the Court were to credit Nystrom's testimony that two crewmembers were breaking ice in the hold, Nystrom has not shown that two crewmembers removing ice out of the way of the longshoremen would equate to substantial control of the hold as to activate the active control duty.  Indeed, Nystrom admits that the

crewmembers were working out of the way of the longshoremen and not interfering in their activities. These activities do not amount to substantial control and would not lull a reasonable longshoreman into thinking that the vessel's crew would ensure that the deck was ice free.

10. Nystrom also has not shown that the vessel's crew were negligent. His theory, stated plainly, is that the deck inside the freezer hold was too slick and the vessel's crew should have done more to clear the ice. But the vessel's crew's actions and the reasonableness of the condition of the freezer hold must be viewed from the perspective of an expert and experienced stevedore working in Alaska. Gumera and Murphy testified that decks routinely were slippery in freezer cargo holds, and that stevedores were accustomed to and expected slippery conditions. The Court concludes that an expert and experienced stevedore would not have reasonably expected the vessel crew to remove all ice from the deck as it formed. Ice forming on the deck while there is precipitation is inevitable and expected and is not an unreasonable hazard for professional longshoremen. Put another way, a vessel owner who hires professional longshoremen in Dutch Harbor is entitled to rely on the stevedore to know how to navigate reasonably icy conditions in freezer holds. Finally, to the extent that the crew were actively cleaning ice up as it formed, the Court finds that they acted reasonably in doing so and were not negligent.

### III. CONCLUSION

Plaintiff's negligence claim is denied. The Clerk is directed to enter judgment in favor of Defendants.

IT IS SO ORDERED this 19th day of March, 2023, at Anchorage, Alaska.


                                    _/s/ Joshua M. Kindred_
                                    JOSHUA M. KINDRED
                                    United States District Judge